Robert FINNEY (Lawrence J. Holt)
et al., Petitioners,

v.

Terrell Don HUTTO, Commissioner of
Correction, State of Arkansas, et al.,
Respondents.

No. PB–69–C–24.

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

March 19, 1976.

Jack Holt, Jr., Philip E. Kaplan, Phillip H. McMath, Little Rock, Ark., for petitioners.

Jim Guy Tucker, Atty. Gen., State of Arkansas, Robert A. Newcomb, Jack T. Lassiter, Asst. Attys. Gen., Little Rock, Ark., for respondents.

HENLEY, Circuit Judge, Sitting by Designation.

These consolidated cases are now before the court pursuant to the mandate of the Court of Appeals in *Finney v. Arkansas Board of Correction,* 505 F.2d 194 (8th Cir. 1974), reversing the decision of this court in *Holt v. Hutto,* 363 F.Supp. 194 (E.D.Ark.1973),[1] and remanding the litigation for further proceedings. The remand requires the court to inquire again into the federal constitutionality of practices and conditions existing and prevailing in the principal penal institutions administered by the Arkansas Department of Correction, an agency of the State of Arkansas.

Petitioners are Arkansas convicts who have been convicted of felonies in the circuit courts of the State and who are now confined in the Department. The principal respondents are Correction Commissioner Terrell Don Hutto, the members of the Arkansas State Board of Correction, A. L. Lockhart, Superintendent of the Cummins Unit of the Department, and R. G. Britton, Superintendent of the Tucker Intermediate Reformatory. Jurisdiction is predicated upon 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983.

Pursuant to the remand extensive hearings have been held,[2] and in mid-August, 1975 the court accompanied by court personnel and counsel on both sides visited the principal units of the Department and also visited the new Reformatory for Women which was then nearing completion in the City of Pine Bluff, Arkansas.

The cases before the court are in part class actions brought by and on behalf of inmates of the Department generally, and in part individual complaints of particular inmates. In view of the large number of complaints that have been consolidated, this opinion will be confined to the class claims in which petitioners seek for themselves and other inmates similarly situated declaratory and injunctive relief with respect to alleged institutional conditions and practices which they claim deprive inmates of rights protected by the Constitution of the United States. Inmate claims of personal deprivations, including claims for money damages, will be dealt with later. The cases collectively will generally be referred to herein as "the case" or as "this litigation."

The Department administers three principal institutions and a number of recently established off-stations. The principal units are the Cummins Unit, a maximum security farm type prison located in Lincoln County, Arkansas; the Arkansas State Reformatory for Women located on the Cummins property; and the Tucker Intermediate Reformatory located in Jefferson County, Arkansas. The off-stations are the Alcoholic/Narcotic Rehabilitation Center located on the grounds of the Benton State Hospital a little more than twenty miles from Little Rock, Arkansas, a Work Release Center and a Pre-Release Center also located at the Benton State Hospital; the

---

1. The court has written three *"Holt"* opinions dealing with the Arkansas prison system. The opinion above cited is frequently called *"Holt III."* *Holt I* appears as *Holt v. Sarver,* 300 F.Supp. 825 (E.D.Ark.1969). *Holt II* appears as *Holt v. Sarver,* 309 F.Supp. 362 (E.D.Ark. 1970), *aff'd,* 442 F.2d 304 (8th Cir. 1971).

2. The hearings extended from January through early July, 1975. Initial hearings were conducted by the court personally. Later hearings were by agreement held before a United States Magistrate, and the testimony heard by him was taken, transcribed, and filed as depositions in the case. In a final hearing conducted by the court personally the testimony of certain expert witnesses was taken in connection with a mental health program recently adopted by the Department.

254

Blytheville Work Release Center located in Mississippi County in the northeastern part of the State; and the Department of Correction Livestock Production Center located near Booneville in Logan County in northwestern Arkansas.

No claim has been made that any unconstitutionalities exist in any of the off-stations. While the Women's Reformatory is involved in the case to some extent, the court is principally concerned with conditions and practices at Cummins and Tucker.

■ In approaching the issues before it the court recognizes that it should not embroil itself unreasonably in the affairs of the Department; in areas of prison administration and security, the classification of inmates, prison discipline, and the like, much must be left to the discretion of the prison administrators. The court is concerned ultimately with constitutional deprivations, and if it finds that such deprivations exist or have existed, the court has the power to intervene and devise appropriate relief. See Kelly v. Brewer, 525 F.2d 394, 399 (8th Cir. 1975), and the numerous cases therein cited.

### Overcrowding

The court first considers whether the principal units of the Department are now overcrowded to a point of unconstitutionality. The matter was discussed in Finney v. Arkansas Board of Correction, supra, 505 F.2d at 200–02.

As to the Women's Reformatory, the court found, on the basis of its own observation of that facility in August, 1975, and of the fact that the new Women's Reformatory had still not been completed and put into use as of mid-February, 1976, that the institution was hopelessly overcrowded. And on February 18, 1976 the court entered an order directing that the institution be closed and the inmates transferred or released not later than June 30 of the current year.

Since that order was entered, Commissioner Hutto has indicated compliance with it and has stated publicly that the June 30 deadline will give the Department no trouble. The court hopes that the new Reformatory will be completed and put into use substantially before June 30.

■ Turning now to Cummins and Tucker, the court recognizes at the outset that the serious overcrowding of a prison operates adversely on inmate safety, morale, and welfare, on the security and good order of the institution, and on the administration of the prison in general. The question of whether a prison is overcrowded to the point of unconstitutionality involves more than determining how many square feet of living space are allocated to individual inmates. Regard must be had to the quality of the living quarters and to the length of time which inmates must spend in their living quarters each day; further some small housing units although cramped may be more comfortable and livable than more spacious quarters.

The question of overcrowding actually involves two questions: First, is the institution as a whole overcrowded? Second, are individual housing units within the institution overcrowded? In other words, the question is not only how many inmates are housed in the prison but also how the prison population is distributed throughout the institution.

Roughly speaking, Cummins houses about three times as many inmates as does Tucker, and, as a class, the Cummins inmates are older men and more hardened criminals than are the inmates of Tucker.

In both Holt I and Holt II the court found that both of the institutions in question were seriously overcrowded, and that the overcrowding constituted a serious threat to inmate safety, particularly when considered in connection with the trusty guard system which was still in use when Holt II was decided in 1970. As of that date the population of Cummins had been declining for some time, and amounted to somewhat less than 1,000 men; at the same time Tucker was housing about 325 inmates.

In those days the basic housing units for inmates at both institutions were large, dormitory type barracks, which are still in use. Each barracks contained, and still contains, about 5,000 square feet of floor space, and each has a maximum capacity of not more than 100 men. Additionally, at Cummins there was a separate building which contained a number of isolation cells. At Tucker there were two rows of small cells reserved for persons who had been condemned to die and who were awaiting execution.

By 1973, when *Holt III* was decided, the Cummins population had grown to about 1200 and that of Tucker had grown to about 349. The basic housing units were still the barracks, and each barracks probably had more than 100 men in it. The old isolation cells at Cummins had been abandoned in favor of a new maximum security facility commonly referred to as the East Building. At Tucker the "death cells" had ceased to be used as such, and were being used to hold prisoners in "administrative segregation" or in "punitive isolation." That was the condition that the Court of Appeals found to be unconstitutional in *Finney*. The holding of that court was based in part on the testimony of Commissioner Hutto that the barracks could not "be successfully operated with more than 60 to 80 inmates," 505 F.2d at 201, whereas in truth and fact the respective barracks were housing from 125 to 135 men.

When the 1975 hearings were held, the overcrowding at both institutions was worse than it was in either 1973 or 1974. The population at Cummins had grown to 1518 and that at Tucker had grown to 501. According to Mr. Hutto, the population growth was not attributable to any defect or malfunction of the Arkansas parole system, but solely to the fact that inmate intake began to exceed releases about the first of 1974.

The 1975 record reflects a difference between the testimony that Mr. Hutto gave about barracks capacity in 1973 and that which he gave in 1975. In 1973 he had said that there should not be more than 60 to 80 men in a given barracks; in 1975 he raised that figure to 100. He explained the difference by saying that when he was testifying in 1973 he had convenience of administration, rather than overcrowding, in mind, and that as far as overcrowding is concerned, each barracks can properly house 100 men without loss of administrative efficiency. However that may be, the fact remains that as late as the date of the court's August, 1975 inspection of the prisons all of the barracks at both Cummins and Tucker had substantially more than 100 men in them, and inmates who could not be housed in the barracks and who were not in the East Building at Cummins or in the administrative segregation-punitive isolation cells at Tucker, were being housed in facilities that were not designed originally for the housing of inmates.

A report filed with the court and which is a part of the record reflects conditions as they existed on November 12, 1975. That report reveals that since August, 1975 the overcrowded conditions at both Cummins and Tucker had been alleviated substantially as a result of a number of factors.

To start with, in the late summer and early fall of 1975 the rate of inmate discharges began to exceed the rate at which new inmates were being received at the prisons. As a result of this trend, the population of Cummins had declined to 1451, and that of Tucker had gone down to 486.[3]

---

**3.** Shortly after directing the closing of the Women's Reformatory, the court made a personal inquiry of Commissioner Hutto as to the current population of Cummins and Tucker in mid-February of the current year and was advised that the downward trend in the populations of both institutions had continued, and, further, that the population of the Women's Reformatory was lower than it had been in November, 1975.

In the second place a modern minimum security building equipped with cells for single occupancy had been largely completed and put into active use.

And finally the Department had been able to acquire and install a large number of house trailers to provide housing for some 12 inmates per trailer.

However, the report reflects that 27 inmates of Cummins were being housed in a gymnasium area, and that 57 inmates who were not ill were being housed in part of the infirmary facilities. And the report also shows that at Tucker a substantial number of inmates were being housed temporarily in what had been a part of the commissary facility.

The November report reveals that the Department estimates that the capacity of Cummins is 1638 men, and that the capacity of Tucker is 632 men. Those capacity figures are based on 100 men for each of the large barracks and 12 men for each of the house trailers. The Cummins figures show four minimum security "pods" with a capacity of 62 men each, and another minimum security building with a capacity of 62 men. The Cummins figures also show continued use of the gymnasium area with a capacity of 30 men, part of the infirmary building with a capacity of 59 men, the infirmary proper with 25 beds, and the "dog kennel" with a capacity of six men.[4] The Cummins report also reflects that East Building has a capacity of 120 men. The report indicates that at Tucker all of the inmates are housed in the large barracks, the house trailers, and the maximum security unit, which unit has a rated capacity of 28 men, the "dog kennel" with a four man capacity, and the eight bed infirmary.

If the occupancy figures appearing in the report and the capacity figures appearing therein are both accepted as correct, it appears that on November 12, 1975 Cummins was occupied to the extent of about 89% of capacity, and that Tucker was occupied to the extent of about 77% of capacity.

Those total figures, however, do not tell the whole story, and it is necessary to consider how the total populations of the two prisons are distributed among the individual housing units in each institution.

While none of the large barracks at Cummins had as many as 100 men in it on November 12, 1975, not one of the eight had less than 94 inmates. There were 99 inmates in one barracks, 98 in another, 97 in a third, 96 in four and 94 in one. One of the minimum security "pods" with a capacity of 62 men had not been completed and was housing no inmates. One of the completed "pods" was filled to capacity, and the other two had 61 and 60 inmates respectively. The report also indicates that the trailer complexes are not being used to an extent approaching capacity. Each complex contains six trailers that are used to house inmates, and, as stated, the rated capacity of each trailer is 12 men. In November the number of occupants in the respective trailer complexes varied from 59 to 54; thus, the highest rate of occupancy was about 81% and the lowest was 75%.

With particular regard to the East Building, the report shows a capacity of 120 men and an occupancy of 111, or an occupancy rate of some 92%. But the East Building figures, as set out in the report, overlook the fact that the building has three wings, each of which should be considered as a separate housing unit. What imbalance or imbalances exist among the separate wings, the court does not know.

In any event, the court is not willing to accept the proposition that the East Building over-all has a capacity to house 120 maximum security inmates without overcrowding. While the report describes the building as containing mainly two to four man cells with some cells being isolation cells, Respondents' Exhib-

---

4. The dog kennel is the building where the prison bloodhounds are kept. The building has certain living facilities in which inmate dog handlers are housed.

it # 654 which is a slick paper brochure describing the East Building and prepared by the architects and engineers who designed it, seems to indicate that the cells in the building were actually designed to house only one prisoner each. In Holt III the court was not disturbed by the idea that two men were being housed in the same cell in the East Building, but the court now finds that frequently the cells have been used to house three or four men at a time with the men being required to use a single wash basin and toilet. And when one of the cells is used to house more than two people, one or more of them has to sleep on the floor. Regardless of what the theoretical capacities of the cells may be, the court finds that the East Building, or particular units thereof, has been chronically overcrowded and that something must be done about the situation.

At Tucker the distribution of inmates last November among individual housing units was more encouraging than at Cummins, and the large barracks were not nearly so crowded. The most densely populated of the four barracks was C Barracks, and it had only 81 men in it on November 12, 1975. Of the 16 house trailers, four were filled to capacity; three had 11 occupants; four had ten inmates each; one had nine; one had eight; and two had seven. One trailer had no occupants.

The disparities of occupancies among the individual housing units appear to the court to be due in large measure, if not principally, to the policy of the Department to assign men to living quarters on the basis of their job assignments. That policy is understandable from the standpoint of security and convenience of administration, but it can bring about the overcrowding of particular units, and it does not contribute to the efficient use of living space, as such.

While ordinary inmates do not spend all of their waking hours or even most of them in their living quarters, they do sleep there and spend most of their non-working time in their quarters where they have essentially no privacy. Living in the barracks at Cummins or Tucker is not nearly as dangerous for an inmate as it was some years ago. However, incidents of violence do occur in the barracks, and two men have been murdered in barracks by other inmates since the court visited the prisons last August. It should be said, however, that the first of those two killings broke the Department's very enviable record of not having had an inmate killed by another inmate since 1971.

The court has given very careful consideration to this aspect of the case. Assuming at least for purposes of argument that Cummins and Tucker were not unconstitutionally overcrowded in November of last year or in February of this year, and assuming that they are not overcrowded today either from the standpoint of the over-all institutions or from the standpoint of individual housing units, the fact remains that they have been seriously overcrowded in the recent past, and unless prevented the overcrowding may recur.

The problem has long-term and short-term solutions. The housing of convicts in parts of gymnasiums or infirmaries or in essentially short-term housing units such as house trailers, is not an acceptable long-term solution. Long-term the problem can be solved only by replacing the existing main buildings at Cummins and Tucker, which contain the old barracks, and which are old and outmoded, by modern and adequate housing facilities, or by reducing prison populations as by dispersing inmates to off-stations or by constructing one or more smaller prisons conveniently located. That Mr. Hutto and the Board of Correction may favor the latter approach is indicated by Mr. Hutto's testimony last summer that no additional construction at Cummins is contemplated, and that it is not felt that Cummins should be a larger institution than it now is.

There is very little, if anything, that the court can do immediately about long-term solutions to the housing problem. As to the short-term solution, the court finds and concludes that the maximum

population at Cummins should not exceed 1650 inmates, and that the maximum population at Tucker should not exceed 550, and the decree to be entered will freeze the maximum populations at those numbers. Additionally, respondents will be required generally or in circumstances other than exceptional not to exceed the unit capacities set forth with respect to the various individual housing units, other than the East Building, set forth in the report of November 12, 1975. The court recognizes, of course, that in emergency situations unit capacities may have to be exceeded to some extent for limited periods of time. The court will deal specifically with the East Building in a later section of this opinion.

### Medical Services and Health Care

■ A state owes to its convicts a constitutional duty to provide them reasonable and necessary medical and surgical care, and this duty extends to the field of mental health and also to other fields of health care. *Finney v. Hutto, supra; see also Seward v. Hutto,* 525 F.2d 1024 (8th Cir. 1975). The existence of this duty was recognized by the Arkansas penal system as early as *Talley v. Stephens,* 247 F.Supp. 683 (E.D.Ark.1965).

■ On the other hand, except in cases of emergencies, the need or desire of an inmate for medical service at a particular point in time must be balanced against legitimate institutional interests of the prison administration.

The Arkansas Department of Correction furnishes its inmates both on-station and off-station health care. The on-station care is provided by a full time physician employed by the Department who divides his time between Cummins and Tucker and who also treats female inmates of the Women's Reformatory. The doctor is assisted in his work by paramedical personnel at both Cummins and Tucker, whom the court considers to be adequately qualified to perform the tasks appropriate to their professions. Infirmaries, including pharmacies, are maintained at both Cummins and Tucker. The court finds that the infirmaries are reasonably well equipped and are adequate to provide ordinary types of care reasonably to be expected in a prison infirmary. No one claims that the infirmaries are hospitals or that they are equipped as such.

The Department also provides its inmates with somewhat rudimentary dental care which is administered by two part time dentists. The care appears to be limited to the filling and extraction of teeth and the furnishing of prison made dentures. The equipment at Cummins and Tucker appears to be adequate for the limited uses to which it is put.

When an inmate is admitted to the Department, he is given a physical examination which includes an examination of his eyes. Inmates are advised that if they develop eye complaints while in the institution, they should follow regular sick call procedures. If an inmate needs glasses, they are supplied, and the initial furnishing is gratis. If an inmate loses his glasses through carelessness or neglect, he may be required to pay for a replacement. Since most inmates are indigent and opportunities for an inmate to earn money legitimately while in the Department are quite limited, it may be difficult if not impossible for an inmate to pay for a new set of glasses. The court doubts that the on-station facilities at either Cummins or Tucker are adequate to detect eye diseases or conditions such as cataracts or glaucoma, particularly at the early stages of development.

Contagious diseases can create problems for any prison, and the matter of the spread of contagious diseases is closely connected to the sanitary conditions of the institution. A common ailment of prison inmates is infectious hepatitis, and while fortunately there has not been to the court's knowledge a serious epidemic of hepatitis in the Department, there are and have been many cases of it. Likewise, there has been some apprehension about the incidence and possible spread of tuberculosis in the

Department. As far as tuberculosis is concerned, the record contains detailed descriptions of the steps that are being taken by the Department in cooperation with the Arkansas Department of Health to detect the disease, to treat it and to render it non-communicable if it appears in an inmate. The court finds that the sanitary conditions that prevail in the Department are reasonably satisfactory on the whole, but there are some improvements that ought to be made, and a particular effort should be made to keep flies out of the prison buildings, including kitchens and dining areas. Naturally, the incidence of flies varies substantially with the seasons; and flies may be able to get inside the buildings to a greater extent during days on which there is an unusual amount of activity in the buildings than on ordinary days.

For many years inmates who required off-station care were transported to Little Rock where they were treated and hospitalized, if need be, at the Arkansas State Hospital which is located in close proximity to the University of Arkansas School of Medicine and to the University Medical Center, including University Hospital.

In August of last year following the closing of the hearings that have been described, the Department for reasons not appearing of record seems to have terminated its arrangement with the State Hospital and to have supplanted it with a contract with the Jefferson County Hospital in Pine Bluff under the terms of which the Hospital, which is publicly owned, will provide compensated in-patient hospital services to inmates of the Department who may be sent there from the prisons. That care is administered by physicians and surgeons engaged in private practice in Pine Bluff and who are willing to participate in the program. The contract is terminable at the will of either party.

Transportation between the units of the Department and the Hospital is now provided by ambulances owned by the Department and stationed at both Cummins and Tucker. Pine Bluff is much closer to Cummins than is Little Rock and is somewhat closer to Tucker. Until last summer, the Department owned no ambulances.

The arrangement between the Department and the Jefferson County Hospital is not intended as a permanent one. The Department now has under construction a hospital of its own in Pine Bluff located near the new Women's Reformatory that has been mentioned. This hospital when completed will be in all respects a modern, up-to-date and fully equipped and staffed hospital facility. It will not only provide medical and surgical care for inmates but will also serve as a reception and evaluation center for all new inmates. The staff will include one or more psychiatrists or clinical psychologists.

The Department hopes to have this new hospital completed and in operation by 1977. However, the court's experience with the construction of the Women's Reformatory causes it to be somewhat skeptical about target dates for the completion of Department construction, particularly in view of the fact that much of the work is done by prison labor.

The court will observe, as it has done in the past, that many of the inmates of the Department suffer from serious mental and emotional illnesses and disturbances. Historically, the Department has done nothing for those people except treat them with drugs, and send violent inmates to the State Hospital to be held temporarily until their periods of violence subside or are brought under control. Until very recently the Department has never had any systematic mental health program for inmates; nor has the Department ever employed a full time psychiatrist or psychologist although it has had from time to time the benefit of part time services of members of those professions who have not had any meaningful opportunity to engage in any extended counselling with or treatment of disturbed inmates.

Last year the Department adopted and put into limited operation a group therapy program designed to aid inmates having correctible character or emotional defects. This program was devised and its practice is taught by the Asklepieion Foundation of Carbondale, Illinois and is sometimes called "AF." Mr. Hutto testified at some length about the program, and the court personally heard a good deal of expert testimony about it on the final day of the 1975 hearings. The program is closely akin although not identical to transactional analysis, and the witnesses expressed great hopes for it as applied to convicts.

The court thinks that the establishment of the program in the Department is certainly a step in the right direction and that it should be extended to the extent feasible if it appears to be getting results. However, the program is probably not suited to all inmates, and it should not be used to the automatic exclusion of other programs of mental health that may show promise. Nor does the court think that the initiation of a program or programs of group therapy takes the place of regular psychiatrists or psychologists to be used in diagnosing, evaluating and endeavoring to treat individual inmates by conventional methods of individual psychotherapy.

Getting back to the subject of on-station care and the adequacy of the facilities and services available at Cummins and Tucker, it appears to the court that the Court of Appeals in reaching its adverse decision on this phase of the case was influenced in substantial measure by the results of a study that was made in 1972 by the Arkansas State Department of Health at the request of the Board of Correction. The report of the results of the study pointed out many serious deficiencies in the health care offered by the Department and was discussed at some length in *Finney v. Arkansas Board of Correction, supra,* 505 F.2d at 202–04.

Since that report was made, there have been numerous and substantial improvements at both Cummins and Tucker, but the court thinks that remediable deficiencies probably still exist. It has been some four years since the study was conducted, and the court is going to direct the Department to request that another study be made as soon as practicable. The Department will be expected to follow any reasonable suggestions that the Health Department may make. The study requested should not be limited to the adequacy of personnel and equipment at the prisons, but should also extend to the adequacy of on-station services offered and to such things as sanitary conditions at the prisons and the adequacy of the means being taken to prevent or control the spread of contagious diseases, including tuberculosis.

The existing arrangement between the Department and the Jefferson County Hospital is not ideal. The Hospital was not designed as a prison hospital; it is not under the control of the Department or any other agency of the State itself, and the doctors practicing therein are not state employees. Moreover, the court is not willing to permit the Department entirely to sever its connection with perhaps more advanced facilities and services that may be available at Little Rock. The court thinks it probable that the Department in fact has a contingency arrangement with the State Hospital or the Medical Center whereby inmates can have the benefit of facilities and services that may be available at those institutions and which may not be available at Pine Bluff. If no such contingency arrangement exists, the Department will be expected to undertake to negotiate one as soon as possible.

What has just been said is not to be taken as a disparagement of the Jefferson County Hospital or of the physicians who practice in that hospital or as a disapproval of the existing contract. The court is simply not willing to permit the Department to rely entirely on the Pine Bluff facility to provide off-station care that inmates may need.

As has been said, the court thinks that the Department should now proceed to employ on a full time basis one or more psychiatrists or psychologists for the pur-

poses that have been indicated, and to provide adequate quarters and facilities for the work of the new employees. Those requirements will be made.

With regard to inmate access to available health care services the court finds that the Department has no custom or policy of denying necessary care to any inmate who needs it, and further finds that inmate access to the prison physician and to the infirmaries and their personnel is reasonably adequate. Regular sick calls and "pill" calls are made at both Cummins and Tucker each day. A sick call is made by paramedics at the East Building each day, and the prison physician visits the East Building once a week.

It is true that in some isolated instances inmates may have been denied treatment improperly or may have not been given proper treatment. Such isolated instances, however, would appear to be the result of nothing but administrative or professional error, and they do not result from any departmental policy. Of course, it ought to be unnecessary to point out that it is absolutely impermissible for any Department employee deliberately to refuse to treat an inmate or to deny him prescribed medication for reasons of spite or as a means of retaliation or punishment for misconduct.

To the extent that individual inmates complain that on particular occasions they have been denied treatment or medication, the court thinks that such claims can be dealt with adequately when the court considers the individual claims for relief that are before it.

Before concluding this section of this opinion, the court desires to deal to some extent with the problem of malingering by inmates. Unless they are physically or mentally disabled, inmates of the Department are expected to work, and many of them are required to work hard and for long hours. Some inmates will feign illness to avoid work, and some will go so far as to injure themselves to avoid duty. This tendency of inmates to shirk work by feigning illness creates a real problem for the prison administra-

tion, and malingering is quite properly a major disciplinary offense and may be punished severely.

There is one aspect of the problem, however, that gives the court some trouble. Inmates can and do become ill on occasion while at work. If an inmate complains of illness while working in the fields, for example, and expresses a desire to go to the infirmary, his request will ordinarily be granted by his supervisor and he will be transported to the infirmary from his place of work. But, when the inmate asks to be taken to the infirmary in such circumstances he runs the risk of being charged with malingering unless the doctor or the paramedic who examines him finds that he is sick enough to be put to bed or at least to receive an excuse from working for the remainder of the day. If the inmate is so charged and found guilty, he may be confined in punitive isolation, or may lose good time or be reduced in classification, or he may be subjected to a combination of those sanctions.

The court recognizes that an inmate may go to work on a particular day and later pretend to be ill in order to obtain at least a brief respite from labor while being carried to the infirmary, and that this gives a problem to those in charge of inmate work crews. But, an inmate who becomes ill or honestly thinks that he is sick should not be discouraged from seeking medical attention by fear of being exposed to a major disciplinary proceeding should the person who examines him conclude that there is nothing serious the matter with him.

The court thinks that the problem can be solved, at least in part, by providing that before an inmate can be found guilty of malingering by a disciplinary committee or a panel thereof, the committee or panel must consult with the doctor or other person who examined the inmate and determine that in the opinion of the examiner the accused inmate was in fact a malingerer on the occasion in question. The mere fact that the inmate in question was returned to his place of work without being put to bed or given

a "lay-in" for the day is not enough automatically to justify a conviction. The decree to be entered will so provide.

### Rehabilitation

Unlike the situation that existed in 1973, the rehabilitation picture within the Department is now quite bright, and the court finds it free of constitutional deficiencies.

With the possible exception of the livestock operation at Booneville, all of the off-stations mentioned in an earlier portion of this opinion were established in 1975, and their rehabilitative value is obvious.

In 1973 the Arkansas Legislature established the Department of Correction School District, and the educational program offered by that district is comparable to the program available in the public schools of the State. If a trustworthy inmate completes his high school education while an inmate of the Department, he can arrange to pursue his education at the college level if he desires to do so. The educational program, which is available to all inmates of the Department, was discussed in some detail by the court in *Rutherford v. Hutto*, 377 F.Supp. 268 (E.D.Ark.1974), to which opinion reference is now made.

In addition to the educational program available to female inmates of the Department, those inmates are being trained in ceramics and in other areas. Hopefully, when the women are moved into their new institution rehabilitative opportunities will be broadened further.

Extensive vocational training is available at both Cummins and Tucker. An inmate at Cummins may be trained in the repair of farm equipment and furniture, in upholstering, welding, building maintenance, and "graphic arts." A Tucker inmate may be trained in the repair of automobile bodies, in the tuning up of automobile engines, welding, woodwork and drafting.

The graphic arts program at Cummins deserves particular mention. It teaches offset printing and perhaps other forms of duplication, and inmates who have completed the course and have been released have been quite fortunate in finding jobs in which their newly developed skill can be employed.

Finally, although the health care provided by the Department has been criticized, it appears to the court that a good many inmates emerge from the Department in better physical condition than they were in when they were received as inmates, and that in itself has rehabilitative value.

### Regulations as to Mail and Visitors

The Department's regulations relating to inmate mail which gave the Court of Appeals trouble, 505 F.2d at 210–12, were promulgated prior to the decision of the Supreme Court in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Since that decision the regulations, which appear as part of Chapter IV of the January, 1975 edition of the Department's Inmate Handbook, have been revised. The court finds that the revised regulations are quite liberal and comply with constitutional requirements.

Regulations dealing with visits between inmates and members of their families and friends also appear in Chapter IV of the Handbook, and they appear to the court to be reasonable and appropriate.

### Legal Assistance to Inmates

The opinion in *Finney* deals in part with the adequacy of legal assistance available to inmates, and this court was directed to "reexamine procedures relating to inmate assistance to satisfy the alternative requirements of *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969)." *Finney v. Arkansas Board of Correction, supra*, 505 F.2d at 213.

The court finds that the legal assistance available to inmates, including assistance rendered by fellow inmates, at times called "writ writers," is and has been adequate, and that the Court of

Appeals may not have been advised fully in this area.

As to inmate assistance to other inmates, the court knows full well that writ writers have functioned freely and without hindrance in the Department for years, and that the representation to the contrary made to the Court of Appeals by one of the appellants in *Finney* was simply false.[5]

The Court of Appeals was also not fully informed as to the status and function of the Legal Adviser to Inmates. The Legal Adviser is a full time employee of the Department, and is a licensed lawyer. His services are available without charge to inmates of all of the units of the Department. The Adviser is in a position to serve and does serve inmates in numerous fields, and the statement that the Adviser "is not permitted to assist the prisoners in civil litigation," 505 F.2d at 213, is not an accurate one.

It is true that the Adviser is not in a position to represent inmates who wish to file § 1983 petitions seeking relief against their keepers. But he can and does represent inmates in civil proceedings generally, including proceedings for post-conviction relief either in the Arkansas state courts or in the federal courts. That the efforts of the Adviser have not been unsuccessful in habeas corpus context is demonstrated by the recent decision of this court and of the Court of Appeals in *Sanford v. Hutto*, 394 F.Supp. 1278 (E.D.Ark.), aff'd, 523 F.2d 1383 (8th Cir. 1975). *See also Bumgarner v. Lockhart*, 361 F.Supp. 829 (E.D.Ark.1973).

Before leaving this subject the court will point out that apart from the assistance of the Legal Adviser to Inmates and of fellow inmates, Arkansas convicts who can afford to do so are always free to employ counsel of their choice, and

that indigent inmates are entitled in proper cases to judicially appointed counsel in connection with either civil or criminal proceedings in the state or federal courts.

The court recognizes that if the legal assistance to be given by one inmate to another is to be effective, the inmate giving the assistance must have reasonable access to some library facilities. Law libraries have been purchased at both Cummins and Tucker. The court has inspected them and finds them adequate for inmate use and that access to them is reasonably available subject to restrictions which are not inappropriate.

### Inmate Safety

In this section of the opinion the court will discuss the question of whether the Department is exercising ordinary care for the safety of inmates from abuse and violence at the hands of other inmates, and the question of whether living conditions at Cummins or Tucker are so unreasonably dangerous to inmates as to make confinement in either of those institutions unconstitutional.

The questions have been stated as above because it may be doubted that any prison is a "safe" place for an inmate to live. Regardless of how well constructed, organized, and administered a prison may be, incidents of violence of various kinds, including homosexual violence, are going to occur from time to time. And the court has already mentioned the killing of two inmates by other inmates since August of last year.

In the very nature of things a state cannot be held to be an insurer of the safety of the inmates of its penal institutions. But a state does owe to convicts the duty to use ordinary care for their safety, and a state cannot be permitted to maintain a penal institution in which

---

5. The representation in question was made in connection with one of the appeals of James G. Ellingburg, which appeals were consolidated with the appeal in *Finney* proper. *See* 505 F.2d at 213. Ellingburg is himself a notorious prison writ writer and prepared many petitions both for himself and other inmates while confined in Cummins from about 1972 until his release in the summer of 1975. As the court recalls, Ellingburg handled his own appeals, and the representation in question is not to be attributed to counsel for petitioners in *Finney*.

conditions are so dangerous that the inmates must exist in dread of imminent injury or death inflicted by other inmates.

In years past an ordinary inmate of the Department, referred to then as a "ranker," was in almost constant danger from other rankers, and he was also in danger of being killed by armed inmate guards. His danger of attack from other rankers was enhanced by the fact that the trusty guards would do little or nothing to protect him, and that the inmate floorwalkers assigned to patrol the barracks at night were of little, if any, value as far as inmate safety was concerned.

In *Holt II* the trusty guard system (and other aspects of the trusty system) was held to be unconstitutional and was ordered to be phased out with the trusties being replaced by civilian personnel.

By the time of *Holt III* the trusty guards had been replaced except for a few armed inmates who were stationed in the towers and the inmate dog handlers who were armed when the prison bloodhounds were being used in pursuit of an escaped convict or a criminal.[6]

The court finds that at the present time the Department uses no armed inmates as guards or in any other capacity, including the handling of dogs. Thus, an inmate today is in no danger of death or injury at the hands of another inmate in whose hands a weapon has been placed by the Department.

In the course of the hearings counsel for petitioners suggested in their examination and cross-examination of witnesses that the continued use of inmate floorwalkers to patrol the barracks at night was a relic of the old system, and that it should be prohibited. The court does not agree.

The floorwalkers are unarmed and have no authority with respect to the inmates over whom they are supposed to watch. While the court doubts, as it has doubted in the past, that the floorwalkers are of much protection to sleeping inmates, they are not a source of danger to inmates; their presence may have some deterring effect on the "creepers" and "crawlers" mentioned in *Holt II*, and according to Commissioner Hutto and Superintendent Lockhart they serve certain other useful purposes as well.

What has just been said about the floorwalkers who operate in the barracks is generally applicable to the inmate turnkeys who are stationed outside the doors of the respective barracks.

The actual guarding of inmates from other inmates is now done by civilian guards who are always stationed outside the barracks and who can readily come to the assistance of an imperilled inmate. And inmates who are working in the fields are under the guard of free world personnel who are in a position to come to the help of an inmate who is threatened or assaulted by a fellow convict.

Further, regardless of what may be thought about conditions in the East Building at Cummins, a subject that will be reached in due course, the fact remains that the authorities at Cummins have been able to use the building to remove from general population a number of inmates who ordinarily would live in barracks and who would constitute a particular source of danger to other inmates.

The two killings that have taken place in recent months occurred after the record in the case was closed, and the circumstances of the killings have not been developed in the evidence.

While those incidents and other nonfatal incidents that have doubtless occurred are highly regrettable, the court finds that all in all officers and employees of the Department have done a rea-

---

**6.** The court will note at this point that the bloodhounds used by the Department are not "guard" or "attack" dogs. They are not vicious; they are not trained to pursue or attack human beings but simply to follow human scent. When a dog is working, he is under the immediate physical control of the handler. Bloodhounds such as those used by the Department can be, and are, used not only to track fleeing criminals and escapees, but also to track lost or missing persons, including children.

sonably good job in the field of inmate safety over the past three or four years, and the court does not find that the Department is failing to use ordinary care for inmate safety, or that either Cummins or Tucker is today such a dangerous place for an inmate to live as to raise a constitutional problem as far as inmate safety in itself is concerned.

### Race Relations in General

As is well known, social conditions existing in a given community at a given time are apt to be reflected in its prisons. And if a social problem is of a kind that can arise in a prison, it is almost sure to do so and probably in exacerbated form due to the very nature of prison life. No one questions that race relations constitute a major social problem all over the United States today, and it is not surprising to find that the problem exists in prisons all over the country, and the institutions operated by the Arkansas Department of Correction are no exceptions. Indeed, the problem of race relations at both Cummins and Tucker is perhaps the most vexing one to beset the Department, and it manifests itself in a number of areas of prison life and administration.

In discussing certain prison practices and conditions race relations can be ignored up to a point, and the discussions appearing in the preceding sections of this opinion have not made any particular reference to race. However, when one approaches such areas as prison discipline, alleged brutality practiced upon inmates, inmate classifications, and job assignments, racial consists of inmate populations and prison staffs cannot be overlooked, nor can there be overlooked the effect that racial attitudes and prejudices may have, or be alleged to have, on relationships between inmates and between inmates and prison officers and employees.

Race relations, whether in a prison or somewhere else, depend ultimately on the subjective feelings of the people involved. As long as the subjective feel-

ings involved are no more than feelings, no federal constitutional problem is presented. Where, however, those feelings manifest themselves objectively in words, actions, or policies in prison context, constitutional deprivations can result.

Racial attitudes in this country have developed over a very long period of time, and in many people are so deep seated that the persons holding them are not actively conscious that they exist and influence their objective conduct. Thus, a white prison employee may discriminate against black inmates without being really conscious that he is doing so. The reverse of that proposition is also true. Moreover, a member of a minority racial or ethnic group who believes that he is a member of a class that has been systematically discriminated against by members of a dominant majority may see discrimination where none exists. Further, a member of a minority, including a convict, may seek to excuse his own failings, incapacities, or shortcomings by claiming that he has been the victim of racial discrimination when such is not the case.

It is probably unnecessary to say that when one deals with race relations in the Arkansas Department of Correction, one is dealing with members of the Negro and the Caucasian races. If other racial or ethnic groups are represented in the Department at all, the number of their members is so small as to be insignificant.

Negroes in Arkansas are in a substantial minority when compared with the population of the State as a whole. In the Department of Correction, however, black inmates make up nearly one-half of the total prison population and have done so for as long as this court has been familiar with the Arkansas prison system.

Administration of the Department, on the other hand, is clearly under the control of white people. Although in recent years the Department has employed a substantial number of blacks and is try-

ing to hire more, a large majority of the employees are white, and Negroes occupying positions of any real authority are very few indeed.

Regardless of the fact that at Cummins, and presumably at Tucker as well, one finds a number of black employees bearing titles such as Captain, Lieutenant or Sergeant, it appears to the court that the only black person who occupies a position of any real authority in the administration of the prison system is Ms. Helen Carruthers, the Superintendent of the Women's Reformatory. And the court will say at this point that she has done an excellent job with a racially mixed female population in spite of the difficulties, including overcrowding, under which she has been required to work.

Prior to the Department's voluntary integration of Tucker and prior to the integration of Cummins pursuant to the decision in *Holt II,* the court had no real occasion to consider race relations in the Department apart from the question of segregation itself. However, in *Holt III* the court had urgent occasion to discuss those relations and did so in several contexts. *See Holt v. Hutto, supra,* 363 F.Supp. at 201–05 and 214.

In *Holt III* the court found that race relations in the Department were bad, to say the least, and the Court of Appeals certainly did not disagree with that finding. *Finney v. Arkansas Board of Correction, supra,* 505 F.2d at 206 and 209–10.

Most of what the court had to say in *Holt III* by way of criticism of the Department in the field of race relations is still valid today, and the court sees no occasion to repeat those statements here in any detail. While conditions in the Department have probably improved somewhat over the last two years and several months, the court finds that in spite of Departmental regulations and memoranda designed to improve race relations and to eliminate or mitigate the effects of poor race relations, the relations between whites and blacks are still bad at both Cummins and Tucker, particularly at the former institution. And

the court further finds that the poor relations are still due to the factors that the court found causative in *Holt III,* namely a paucity of blacks in positions of real authority that are meaningful to inmates in their day to day prison life, the low caliber of the inmates in general, including black inmates, and the poor quality and lack of professionalism of the lower echelons of prison employees who are in close and abrasive contact with inmates every day.

On the positive side, the court thinks that the members of the Board of Correction, Commissioner Hutto, and Superintendents Lockhart and Britton are conscious of the problem and are working toward at least a partial solution, although in candor the court doubts that race relations, as such, will ever be any better in the Department than they are in the free world; and that observation is as applicable to any prison in the country as it is to the Arkansas prisons.

One hopeful sign is the establishment of the rehabilitative programs that have been described. If they do nothing else, such programs tend to ameliorate the rigors and harshness of prison life, and that amelioration in itself would seem to have a tendency to improve relations between inmates and prison personnel regardless of race. Moreover, providing ignorant or illiterate black inmates with what amounts to a public school education should tend to upgrade them and qualify them for better assignments and a better life inside the prison as well as in the outside world.

Conversely, systematic training of prison employees is calculated to improve their general competency and professionalism, to make them aware of racial attitudes and problems, and to equip them better to deal with inmates of a race other than their own. And it appears from the record that training programs for employees of the Department have been instituted and are being prosecuted.

Respondents' Exhibit No. 687 is a copy of the Department's "Affirmative Action Plan" which was initiated in March, 1974 and which was approved in February,

1975. The plan indicates that the major concern of the Department has been to promote blacks already hired by the Department, and that since March, 1974, out of 198 promotions, 64 or 32.32% have gone to blacks.

The plan further reflects that since March, 1974 the Department has terminated 260 persons of whom 61 or 23.46% were black, whereas during the same period of time the Department hired 274 people, 78 of whom or 28.47% were black. Thus, the hiring of blacks has been in excess of black terminations percentagewise.

According to the plan, new employees are hired without regard to race and entirely as a result of referrals by the Arkansas Employment Security Division, and the plan recites that prior to the utilization of the ESD as a referring service application forms used by the Department did not refer to race. The plan states that between August 30, 1973 and June 30, 1974 the Department's black work force was increased by 2.4%, and that during the period between March, 1974 and May, 1975 the black work force increased by 5.1%.

While the progress reported in the plan is commendable, and while the plan is doubtless sufficient to serve the purpose for which it was formed, and while it has evidently gained the approval of the governmental agency, the approval of which was required, the court doubts that it really reaches the problem that is involved here.

This is not a fair employment practices case. The question is not whether the Department is discriminating against blacks in matters of hirings, promotions, or discharges, but whether the recruitment and promotional policies of the Department are designed to correct or alleviate the racial imbalance of the Department's staff which has contributed so much to the difficulties that the Department has had in the area now under consideration.

What the Department needs to do is not to hire people without regard to race but to make a conscious effort to hire qualified blacks in additional numbers and to place them in positions in the institutions which will enable them to exercise some real authority and influence in the aspects of prison life with which black inmates are primarily concerned.

The Department needs more blacks who are in positions that will entitle them to sit on classification committees and on disciplinary panels, to counsel with inmates about their problems, and to supervise inmates while at work. This need was recognized by this court in *Holt III,* and it was recognized by the Court of Appeals in *Finney,* 505 F.2d at 210.

To illustrate that need: Many of the disciplinary problems of the Department arise in the prison fields where large numbers of black inmates work as members of prison "hoe squads" or "garden squads." An examination of Respondents' Exhibit No. 659 reveals as of June 11, 1975 the field security force at Cummins consisted of a Field Major, a Field Captain, three Field Lieutenants, and fifteen "Correctional Officers II." The major, the captain, and the lieutenants were all white, and of the fifteen correctional officers twelve were white. On the other hand, Respondents' Exhibit 658 reflects that on June 10, 1975 282 inmates were assigned to hoe squads; 54.9% of those inmates were black. The same exhibit shows that on the same date 137 inmates were assigned to the garden squads; 52.5% of those inmates were black. In such a situation racial difficulties, including claims of discrimination, are certain to arise, and they do.

There is no constitutional objection, of course, to the Department's using the ESD as a referring service, but the exclusive use of that agency is not apt to produce applicants the hiring of whom will meet the Department's need to correct the existing racial imbalance of the staff.

The court recognizes, as it has recognized in the past, that it is difficult to

recruit blacks who are qualified and willing to hold responsible positions in the Department; a number of factors are involved, including the rural location of the prisons. But the court is not satisfied that Commissioner Hutto and others connected with recruiting prison personnel have really exerted themselves to the fullest extent possible or have exhausted their resources as far as hiring responsible blacks is concerned.

There is nothing to indicate that the Department's need in this connection has been made known generally to the black population in Arkansas through advertising or otherwise, or that anyone connected with the Department has sought to enlist the good offices of the University of Arkansas at Pine Bluff, which is a predominantly black institution of higher learning and which used to be an all black college, or that help has been sought from such agencies or organizations as the Urban League or the National Association for the Advancement of Colored People, or from any governmental agencies concerned with the welfare of minorities.

Such approaches to the problem might not turn out to be fruitful, but at least they should be explored. Respondents will be directed to make further efforts in the field of black employment and in that connection to give consideration to the court's suggestions although the court is not going to command that any particular suggestion be followed.

In this section of the opinion the court has undertaken to discuss race relations in the Department in a general way. The court will now proceed to examine other specific prison problems. The problems to be considered will include racial discrimination per se and other problems in which race is involved to a greater or lesser extent.

### Racial Discrimination

The racial discrimination now to be considered is alleged discrimination by white prison personnel against black inmates. At this time at least, "reverse discrimination" is not any real problem in the Department.

In a prison which is controlled by white people and in which large numbers of black inmates are confined, opportunities for racial discrimination against the blacks exist in a number of principal fields, namely: inmate classification, including promotions to a higher class or demotions to a lower class, job assignments, disciplinary proceedings, and punishments imposed for infractions of prison rules.

The general subject was considered by this court in some detail in Section II of its opinion in *Holt III, supra,* 363 F.Supp. at 202–05, and the *Finney* court considered it as well, 505 F.2d 209–10. The court has reviewed what it had to say in *Holt III* in the light of the opinion of the Court of Appeals and in the light of the evidence developed in 1975, and finds that it has nothing really substantial to add to what it said in 1973, taking into consideration the fact that there probably has been some improvement in race relations at the prisons since *Holt III* was decided.

As indicated in *Holt III*, racial discrimination is not officially countenanced by the Department and is specifically prohibited by its rules and regulations. As it found in 1973, the court now finds that there is no hard evidence that overt discrimination is being practiced in the Department, although many black inmates think or claim to think that they have been the victims of discrimination. But again as in 1973 the court has the feeling that in instances racial discrimination that is covert and perhaps even unconscious is still going on, and that it is going to continue to go on until such time as the Department itself is adequately integrated along the lines laid down in the preceding section of this opinion.

In its Second Supplemental Decree filed in connection with its *Holt III* opinion the court specifically enjoined racial discrimination in any form and in all significant areas of prison life, and the court does not consider that additional

injunctive relief in connection with the problem is necessary or would be helpful at this time.[7]

### Grievance Procedure

■ A viable grievance procedure in a prison ought to serve to alleviate a number of prison problems, including claims of racial discrimination. The value of such a program generally has been recognized by the Court of Appeals for this circuit in *Willis v. Ciccone*, 506 F.2d 1011 (8th Cir. 1974), and in the later case of *Mason v. Ciccone*, 531 F.2d 867 (8th Cir. 1976).[8] Where such a procedure exists, it can be used to settle expeditiously many inmate grievances without requiring the inmates involved to resort to time consuming litigation which places extremely heavy burdens on the courts, prison administrators, and attorneys. As the law now appears to stand, a state prisoner is not required to exhaust administrative remedies, including grievance procedures, before seeking judicial relief under § 1983. That is not to say, however, that if a state establishes an adequate grievance procedure and administers it fairly and properly, the federal courts might not be inclined at some future date to require the exhaustion of the procedure before the inmate may have his grievance heard in the courts.

The record in this case reflects that in 1974 the Department initiated a formal grievance procedure which is set out in detail at pages 12–14 of the Inmate Handbook. If an inmate with a grievance is not able to obtain relief from his immediate supervisor, he may carry his grievance to the Administrative Review Officer. If that officer does not solve the problem satisfactorily, the inmate is entitled to review by an "Institutional Review Board," consisting of the Superintendent of the institution and two high ranking staff members. The grievance may be carried still further to the "Department Review Committee" and ultimately to the Board of Correction itself. Provision is made for having the grievance considered by impartial people, and it is expressly provided that unless the inmate makes false statements in the prosecution of his grievance, he is not to be subjected to any sort of retaliation for having invoked the grievance procedure.

Mr. Lockhart testified that some use of the procedure has been made at Cummins, and that some grievances have been adjusted satisfactorily. Of course, if inmates will not use a grievance procedure, it is valueless, and they will not use it unless they believe that there is a reasonable possibility of obtaining relief by means of it.

Apart from any formal grievance procedure, the court thinks that the higher echelon officials of the Department should be more available to inmates than perhaps they are, and should keep themselves personally familiar with day to day life in the prisons including the work activities of inmates.

### The Black Muslims

The Department has a number of black inmates who are members of the Black Muslim religious sect. Some of those inmates claim that they are subjected to religious discrimination along with or apart from racial discrimination.

The Muslims in the Department fall broadly into two groups, namely, Muslims who abide generally by prison rules and regulations and who live in general prison population, and Muslims who are more or less consistent rule violators and trouble makers and who spend at least large portions of their time confined un-

---

7. The court will note at this point that this is not a contempt proceeding in which prison officials are sought to be held liable for violations of previous decrees or orders of the court.

8. Both of those cases involved federal convicts who were inmates of the Medical Center for Federal Prisoners at Springfield, Missouri. A federal prisoner complaining of prison conditions or personal mistreatment can obtain by means of a petition for a writ of habeas corpus essentially the same relief available to a state prisoner in a § 1983 proceeding.

der maximum security conditions, principally in the East Building at Cummins. This section of the opinion will deal with the Muslims who live in population, but what is said here will not be irrelevant to the conditions of Muslims in the East Building.

The problem of the Muslims in general population was considered by the court in *Holt III*, 363 F.Supp. at 202–03. The court found that the claims of the Muslims were not without substance, although the court did not find that Department personnel were intentionally discriminating against Muslims as such, and that much of the problem arose from the fact that the prison administrations were simply unaware of what the problems of the Muslims were. The court found that the administration was willing to meet reasonable Muslim demands, and that for the most part the problems of the Muslims could be handled administratively. However, in its Second Supplemental Decree the court specifically enjoined the respondents from discriminating against the Muslims on account of their religious beliefs or the teachings of their religion. And the *Finney* court took note of this court's action in that regard. 505 F.2d at 209.

The court finds that today the Muslims are not unduly restricted in the exercise of their religion. They can hold meetings as can members of other religious sects, the services of Muslim clergymen are not denied to them, and they are free to receive generally circulating Muslim publications.

As it was in 1973, the principal problem of the Department's Muslims today is dietary. As is now generally known, Muslims eschew the consumption of pork in any form; they are not permitted by their religion to eat pork, nor are they permitted to eat any food which has been cooked in pork grease or that has been contaminated otherwise by coming into contact with pork. Unfortunately for the Muslims, pork is frequently served as a food item in the Department, and a good many of the vegetables served to inmates are cooked in pork grease.

The court finds that the Department has made and is making a conscientious effort to supply the Muslims with a pork free diet and to advise Muslim inmates in connection with each meal what dishes they can eat without danger of being contaminated. However, the Muslims are not fully satisfied because in the last analysis they do not trust the Department's cooks and food handlers, including non-Muslim employees and non-Muslim inmates assigned to work in the prison kitchens. And the Muslims fear that they may unwittingly consume food that is taboo to them on religious grounds.

The court does not think that there is much that it can do to remove this distrust by means of further injunction or otherwise. However, the court will enjoin the Department from serving pork to Muslims against their will and from exposing them to food that has been contaminated by contact with pork or pork grease or lard made from pork fat.

Due in part to the small number of Muslims in the Department, the court is not going to order that special kitchens be established for the Muslims or that only Muslims be employed in the preparation of food for the Muslims. Assuming that Muslims will work in a kitchen in which pork is being used as an item of diet or a cooking ingredient, the court thinks that it would be helpful if Muslims were assigned to the kitchens, and the court thinks that in any event non-Muslim kitchen personnel should be properly supervised to prevent the overt or covert, direct or indirect, serving of pork to the Muslim inmates.

While the court does not deem it necessary to order the step to be taken, it might not be amiss for Commissioner Hutto to arrange to have the prisons inspected by free world Muslims and to get their ideas and suggestions about the conditions from the standpoint of religion under which their co-religionists are confined.

*Brutality*

The court will now take up the claim of inmates in general population that they are unconstitutionally subjected to brutality, including verbal abuse, cursing, and the like, by prison personnel. This section of the opinion will be limited to class claims of inmates in general population; similar claims of inmates confined under maximum security conditions will be treated in other portions of this opinion, and individual claims of specific instances of brutality will be dealt with within the framework of individual complaints.

The history of brutality in what is now the Department of Correction is a long one and it has been discussed in detail by judges of this court and by the Court of Appeals. In this connection in addition to the opinions that have been filed in this particular litigation *see Courtney v. Bishop*, 409 F.2d 1185 (8th Cir. 1969); *Jackson v. Bishop*, 404 F.2d 571 (8th Cir. 1968), *reversing in part, Jackson v. Bishop*, 268 F.Supp. 804 (E.D.Ark.1967); and *Talley v. Stephens, supra.*

When the *Holt* cases were first filed in 1969, the grosser abuses considered in *Courtney v. Bishop, Jackson v. Bishop*, and *Talley v. Stephens, supra*, had been eliminated. However, brutality of various kinds was still prevalent when *Holt II* was decided, and it was still a problem at the time of *Holt III.*

On December 30, 1971, a date between the decisions in *Holt II* and *Holt III*, the court felt constrained to file a supplemental decree enjoining respondents from inflicting any cruel and unusual punishment on any individual inmate and from engaging in any general practices or procedures amounting to the infliction of such punishment and also enjoining respondents from interfering with inmates in their efforts to obtain relief in the courts and from retaliating upon inmates for having sought such relief or for having testified or offered to testify in judicial proceedings.

Contemporaneously with the filing of the opinion in *Holt III*, the court filed another supplemental decree which, among other things, defined "cruel and unusual punishment" in broad terms so as to include: the infliction upon any inmate of any unreasonable or unnecessary force in any form; the assigning of an inmate to tasks inconsistent with his medical classification; the use of any punishment amounting to torture; the practice of forcing any inmate to run to or from work, or while at work, or in front of any moving vehicle or animal; and the infliction of any punishment not authorized by the Department's rules and regulations.

Brutality, whether broadly or narrowly defined, is not countenanced in the Department today. Like racial discrimination, brutality in its various forms is strictly forbidden by the prison rules for employees. And it appears that in instances employees who have been guilty of brutality have been discharged or required to resign.

█ It should always be kept in mind that the reasonable use of force by prison authorities is not only permissible but positively required on occasions. Hence, every incident of violence involving an inmate and a prison employee is not necessarily an incident of brutality.

In other sections of this opinion the court deemed it well to mention the killing of two inmates by other inmates that took place after the record herein had been closed. And the court now feels it necessary to mention another fatal incident that took place in August of last year. This incident, unlike the killings that have been described, involved prison personnel to some extent. A young inmate was received at Cummins during the early morning hours on the date of the incident and was put to work with other inmates clearing a ditch bank; he was given no breakfast prior to being put to work, although he did eat lunch. In the afternoon he died in circumstances that were at least suspicious. The incident evoked considerable publicity and stirred up the usual inmate rumors, including charges that the young man had been beaten to death by his

guards. An autopsy was performed on the body, and after a rather strange period of delay, the State Medical Examiner reported his finding that the inmate had not been physically assaulted and had come to his death as a result of heat exhaustion. There is at least some reason to believe that the young man was subjected to "hazing" by fellow inmates and that one or more prison employees may have participated to some extent in the process.

If the foregoing description of the incident is substantially correct, and the court does not know that it is and is making no finding on the subject, the incident was inexcusable, and points up as much as anything else the fact that some employees of the Department are still sadly lacking not only in professionalism but also in ordinary good sense. The court hopes that Commissioner Hutto and Superintendent Lockhart have investigated the incident properly and have taken such disciplinary action, if any, as might have appeared appropriate.

Getting back to the record, the court does not doubt that incidents of violence still occur in the Department and that some of them may amount to physical brutality. Nor does the court doubt that in spite of Department prohibitions some employees are still using foul language and racial epithets when addressing inmates, and that at times inmates are improperly threatened by their guards and supervisors.

The court has given very careful consideration to the question of whether the inmates are entitled to additional class relief in the matter of brutality. In view of the announced policies of the Department and in view of the relief that has already been granted in this sphere of prison life, the court does not consider that much more relief is called for or that it would do any good. However, the court will in the decree to be entered specifically enjoin all Department personnel from verbally abusing, or cursing, inmates, and from employing racial slurs or epithets when addressing or talking with inmates. That specific prohibition may be of some value to higher echelon employees in their efforts to improve the professionalism and conduct of those who are required to work in close proximity to inmates and who have occasion to deal with inmates.

### Disciplinary Procedures

In *Holt III* the court considered disciplinary procedures that were followed by the Department at that time and that had been devised in 1972 or earlier. The procedures were discussed at some length and were approved subject to the Department's compliance with certain specific directives of the court. 363 F.Supp. at 206–08. On appeal, the Court of Appeals considered the procedures in question in the light of the then very recent decision of the Supreme Court in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The appellate court approved of the directives of this court but felt that the procedures in question had to be revamped in the light of the *McDonnell* decision, *supra*. 505 F.2d at 208.

*Wolff v. McDonnell, supra,* was decided on June 26, 1974. Shortly thereafter the Board of Correction promulgated rules and regulations relating to disciplinary matters which appear in the record as Respondents' Exhibit 688 and most of which appear in the 1975 edition of the Inmate Handbook which has been mentioned. The court finds ultimately that the procedures in question meet the requirements of *McDonnell* and are constitutional.

Each institution has a major disciplinary committee and a minor disciplinary committee. The major disciplinary committee consists of at least four prison officials and must include the Associate Superintendent of the institution or his designee; one member of the security staff of the institution, one member of the treatment staff, and the Chief Security Officer of the institution who is a member of the committee but has no vote. The minor disciplinary committee, which deals with rule infractions deemed

to be of a minor or trivial nature, consists of the Shift Supervisor, who serves as Chairman, and any two other department personnel of the Chairman's choosing. While the major disciplinary committee consists of at least four persons, the committee usually sits in panels of three as was the case in 1973 and 1972. A minor disciplinary committee always consists of three members.

A minor disciplinary committee can impose only minor punishments. It cannot sentence an inmate to confinement in punitive isolation, or deprive him of good time, or change his classification or job assignment. The punishments that it can impose are limited to warnings or reprimands, loss of privileges, and limited extra duty. Once a minor disciplinary committee has acted in a given case, its decision cannot be altered by the major disciplinary committee if the inmate accepts the decision of the minor committee. An inmate is not required to accept the decision of the minor disciplinary committee; if he chooses to do so, he may insist upon being proceeded against before the major disciplinary committee in accordance with the procedures applicable to that committee.

It is not entirely clear from the materials before the court what procedures are followed in connection with a minor disciplinary procedure. The rules do provide that a minor disciplinary committee is to function as "expeditiously as possible," and in view of the limitations on the punishments that such a committee can impose and in view of the nature of the violations considered by such a committee, and the fact that an inmate is not required to accept a minor disciplinary decision adverse to him, the court assumes that the minor disciplinary committee acts in a more summary manner than does the major disciplinary committee. The court has no difficulty with that, and thinks that *Wolff v. McDonnell, supra,* recognizes at least by implication that the requirements of procedural due process where only minor rule infractions are involved are less than the requirements that exist where an inmate faces a serious charge that may result in severe punishment.

Turning now to major disciplinary procedures, an inmate facing a major disciplinary charge is required to be served with a written copy of the charge not less than twenty-four hours before the disciplinary hearing that must be held within seventy-two hours after the occurrence of the disciplinary episode, except that in unusual circumstances the Superintendent of the institution may grant limited extensions of time.

The inmate is entitled to appear before the committee, including a panel thereof, and is entitled to present his version of the incident. He may also "call witnesses" in the sense that he may identify potential witnesses to the officer who notifies him of the charge against him. The committee is authorized to call all necessary witnesses. The testimony of a witness may be taken in writing before the hearing or orally before the committee in the course of the hearing.

If in the course of a hearing the panel calls witnesses, the accused is not permitted to be present while the witnesses are testifying; on the other hand, the charging officer is not permitted to be present during the testimony of witnesses. Commissioner Hutto explained this procedure by saying that in view of the conditions of prison life an inmate witness is simply not going to say anything adverse to the accused and is not likely to say anything that may bring him into the bad graces of the charging officer. Consequently, the testimony of inmate witnesses if taken in the presence of either the accused or the charging officer would probably be essentially worthless. The accused is not permitted to cross-examine the employee who prepared the initial disciplinary report and who is frequently the charging officer; in Mr. Hutto's view such cross-examination would be worthless and would be quite likely to cause increased hostility between the inmate and the employee involved and might lead to future confrontations between them. In the court's opinion, Mr. Hutto's views are

reasonable, and the court does not consider that the practices just described offend *Wolff v. McDonnell* or that they violate due process of law.

At the conclusion of the hearing the panel decides the case, and if the accused is found guilty, punishment is assessed. The court presumes that the decision and action of the panel in a given case is determined by the vote of a majority of the members of the panel. If the accused is found guilty, the panel is required to state in writing the reasons for its decision.

An inmate may appeal an adverse disciplinary ruling to the Superintendent of the institution by filing a written notice of appeal within three days after the adverse decision is rendered. However, the Superintendent is not required to review the decision unless he considers that the facts of the case warrant review. If the Superintendent's ruling is adverse to the inmate, the latter may appeal to the Commissioner and finally to the Board of Correction itself. However, the rules provide that if in connection with any appeal an inmate wilfully and knowingly makes a false statement or deliberately tries to deceive the reviewing authority, the inmate's action is in itself a major disciplinary violation.

While *Wolff v. McDonnell* makes it clear that an inmate is not entitled to counsel in the course of a disciplinary proceeding, the Department's rules provide that if an inmate is illiterate or "is otherwise unable to properly present his case, the Chairman may appoint a member of the staff to assist the inmate in his presentation." And the Superintendent is required to provide the Chairman of the committee with a list of staff members who do not regularly sit on the Disciplinary Committee who are available to assist inmates. The court will

pause at this point to commend the Board of Correction for adopting that particular rule because a great many inmates, even if not illiterate, are simply too inarticulate to present their contentions systematically or intelligently. The court hopes that the Disciplinary Committee will make liberal use of the rule in question.

The rules further provide that no disciplinary action is to be taken against any inmate save in accordance with the prescribed procedures, except that a shift supervisor may place an inmate in administrative segregation or barracks arrest pending disciplinary committee action.

The court finds that black employees now sit from time to time as members of disciplinary panels. Assuming that the Department is able to and does employ more blacks and that it pursues its announced policy of promoting blacks where possible, increased black participation in disciplinary proceedings is to be anticipated.

In considering the case the Court of Appeals expressed concern lest a charging officer be a member of the panel hearing the charge, and directed this court to prohibit the charging officer from sitting in judgment on his own complaint. 505 F.2d at 208. That, of course, will be done.[9]

### Punitive Isolation and Administrative Segregation

The rules of the Department specify eight punishments that may be imposed singly or in combination upon an inmate who is found guilty of a disciplinary infraction. Some of the punishments are very light and, as has been seen, may be imposed by a minor disciplinary committee. Other punishments are more severe

---

**9.** The present rules were issued shortly before the *Finney* decision was handed down. The rules, as written, do not in terms prohibit the practice condemned by the appellate court. It is the court's recollection that when Cecil Boren was Assistant Superintendent at Cummins, he, on one occasion, sat on a disciplinary panel in connection with a matter in which he was the charging officer. Mr. Boren admitted the impropriety of his action, and the court doubts that such a thing would happen again. However, the decree to be entered will specifically prohibit the practice.

and can be imposed only by a major disciplinary committee.

The serious punishments take a rather wide range, but there is no question that the punishment that is one of the most dreaded by the inmates and that creates a serious constitutional problem is confinement in punitive isolation.

This section of the opinion will be devoted principally to a discussion of punitive isolation as it is practiced in the Department, and most of the discussion will be based on conditions at Cummins where the problem is more severe than it is at Tucker. Also discussed herein will be the "administrative segregation" in small cells of inmates who are awaiting trial on disciplinary charges.[10]

■ The placing of inmates of a prison in punitive isolation or solitary confinement as punishment for violation of prison rules is not necessarily unconstitutional, but it may be, depending upon the duration of the confinement and the conditions thereof. *Finney v. Arkansas Board of Correction, supra*, 505 F.2d at 207; *Burns v. Swenson*, 430 F.2d 771 (8th Cir. 1970), *cert. denied*, 404 U.S. 1062, 92 S.Ct. 743, 30 L.Ed.2d 751 (1972); *Courtney v. Bishop, supra.*

In 1973 the court found in *Holt III* that confinement in punitive isolation in the former "death cells" at Tucker and in the punitive wing of the East Building at Cummins was not unconstitutional, and in that connection specifically found that the cells in use at the two institutions were not overcrowded, and that the diet of "grue," described in *Holt I*, was not unconstitutional. 363 F.Supp. at 208. The Court of Appeals took a somewhat dimmer view and expressed particular concern as to whether or not inmates held in punitive isolation were adequately supplied with the necessities of life such as proper and sufficient food, heat, light, ventilation and sanitary facil-

ities. *Finney v. Arkansas Board of Correction, supra*, 505 F.2d at 207–08.

From testimony that the court heard in June, 1974, prior to the rendition of the decision of the Court of Appeals in *Finney*, and from additional testimony taken in 1975, and from the court's own inspection of the facilities in question, including both the punitive cells and the administrative segregation cells at both Cummins and Tucker, the court now finds that either conditions were not as good in 1973 as the court thought that they were or that the conditions have deteriorated since 1973. Whichever may be the case, the court now finds from the evidence that unconstitutionalities now exist with respect to both punitive isolation and administrative segregation, and that substantial changes are going to have to be made within the immediate future if the Department is to be allowed to continue to place inmates charged with offenses in administrative segregation and to punish inmates by what is called without entire accuracy punitive "isolation."

An inmate sentenced to punitive isolation receives a sentence to confinement in an extremely small cell under rigorous conditions for an indeterminate period of time with his status being reviewed at the end of each fourteen day period. While most inmates sentenced to punitive isolation are released to population within less than fourteen days, many remain in the status in question for weeks or months, depending upon their attitudes as appraised by prison personnel. It is rare indeed that a prisoner is confined in a cell by himself. Usually, he must share a cell with at least one other inmate, and at times three or more inmates are kept in the same cell which is equipped with extremely limited facilities. Assuming, and the court is not at all sure that the assumption is valid, that all of the isolation cells are equipped with two bunks, it follows that if three

10. While the confinement of an inmate in administrative segregation is somewhat less rigorous in certain respects, including diet, than the confinement of an inmate who has been sentenced to punitive isolation, the two types of confinement are in other respects very similar to each other.

or four men are put in the same cell, and that frequently happens, one or two of them are going to have to sleep on the floor.

Convicts being what they are, that means that the stronger and more aggressive inmates are going to occupy the bunks, and they are also likely to persecute the weaker inmate or inmates. A variant of this is that where three convicts are confined in a single cell, two of them are apt to team up against the third one.

Assuming that an inmate in punitive isolation or in administrative segregation has a bunk to sleep on, he also has a cotton mattress to lie upon during sleeping hours, but the mattress is taken away during each day.

During each basic fourteen day period of confinement, an inmate in a punitive cell is fed on a diet of "grue" unless such a diet is medically contraindicated. He gets no other solid food, except that every third day he receives or is supposed to receive a regular prison meal.[11] And on every third day the inmate is permitted or required to leave his cell for the purpose of taking a shower and probably changing his clothes. While inmates in punitive isolation may now be allowed some limited outdoor exercise, for a long time the only exercise that the inmates in question could take was that involved in going to the shower room, taking the shower, and returning to the cells.

At the end of a basic fourteen day period of punitive confinement, the inmate is weighed to see how much weight he has lost on the "grue" diet;[12] and if it is determined that he should be returned to punitive isolation, he is given regular food for two days and returned to the "grue" diet on the seventeenth day. It is to be observed that the rules specify that during this two day "interim" or "intermission," the inmate need not be moved from the punitive cell to other quarters, and as a matter of practice they are not moved; they simply stay where they are.

An inmate in punitive isolation is not only held in cramped quarters and fed a limited diet, he also loses practically all privileges and opportunities available to inmates in general population. Such an inmate can receive visits from a clergyman, which visits are probably very rare, and he can engage in such correspondence as the Constitution of the United States guarantees or which the prison administration deems to be otherwise "privileged."

As a class, the convicts confined in punitive isolation or in administrative segregation, for that matter, are violent men. They are filled with frustration and hostility, some of them are extremely dangerous, and others are psychopaths. Confined together under rigorous conditions in the same cell or in immediately adjacent cells, the convicts identify with each other and reinforce each other in confrontation with custodial personnel, and those personnel in turn identify with each other and reinforce each other in confrontation with the convicts.

As a result, the punitive wing in the East Building at Cummins is not infrequently a scene of violence. The inmates vandalize their cells to the extent possible, and that extent has been very substantial; they scream and curse; they abuse the guards and at times attempt to assault and injure them. The trouble is made worse by the poor ad-

11. At an early stage of the 1975 hearings the court heard much inmate testimony to the effect that they were "shorted" with respect to their rations on the days on which they were supposed to receive a regular meal. This alleged practice, of which one prison employee in particular was charged, is known as "shaking the spoon."

12. While the evidence is to the effect that "grue," a tasteless and unappetizing substance, will not only sustain life but is adequate nutritionally for an inmate who is not leading an active life, the evidence also discloses that some inmates simply will not eat the "grue" or will not eat much of it, and that practically all inmates lose weight while in punitive isolation. The court will note at this point that inmates in administrative segregation are not required to eat "grue." While they are awaiting trial, they receive regular prison food.

ministrative practice of despatching, say, two correctional officers to quell a disturbance in a cell containing three or four men or to remove one or two convicts from such a cell. Such an approach invites and results in trouble.

From testimony in the record the court is convinced that as a class the inmates of the punitive cells hate those in charge of them, and that they may harbor particular hatreds against prison employees who have been in charge of the same inmates for a substantial period of time. In his hatred of guards in general or of a particular guard, an inmate may deliberately run the risk of injury to himself in order to obtain an opportunity to inflict injury upon prison personnel or upon a particular prison employee.

Inmate violence unavoidably produces a forcible response from prison personnel who may be required to use such things as night sticks and the chemical known as "Mace" to quell disorders. And the court is satisfied that at times the response is excessive, and is further satisfied that many of the episodes of violence that take place in the maximum security facility could be avoided readily if the guards were more professional and used better judgment and common sense in dealing with refractory inmates. This lack of professionalism and good judgment on the part of maximum security personnel in the Department was one of the things that led the court to say in 1973 that the Department's prisons were not so much unconstitutional as they were poorly administered. 363 F.Supp. at 202.

The court agrees with Dr. Arthur Rogers, a clinical psychologist who testified as an expert in the 1974 hearings, that punitive isolation as it exists at Cummins today serves no rehabilitative purpose, and that it is counterproductive. It makes bad men worse. It must be changed.

■ The court thinks that from the standpoint of orderly and efficient prison administration the Department would be better off if inmates sentenced to punitive isolation were kept alone in individual cells. However, the court is not prepared to go so far as to say that it is unconstitutional to confine as many as two men in the punitive isolation and administrative segregation cells at Cummins and Tucker provided that each man has a bunk to sleep on at night and to sit upon during the day. The court will enjoin the confining of more than two men at any one time in one of the individual cells in question and will require that where two men are placed in the same cell, each must have a bunk.

This does not mean that in cases of serious emergency as for example a riot or other type of disorder involving large numbers of inmates at the same time, the prescribed cell capacity may not be exceeded for limited periods of time. But the court does not accept the proposition that every disciplinary incident in the Department creates an emergency, or that an emergency continuously exists at either Cummins or Tucker.

■ As to "grue," it may be arguable as to whether what the Court of Appeals had to say about that substance amounted to a holding that its use as food is unconstitutional. But, even if the language in question does not amount to such holding, which would be binding on this court, it is clear to the court that the constitutional handwriting is on the wall as far as "grue" is concerned, and that its use had as well be outlawed now rather than at some later time or by the appellate courts. And that will be done.

The practice of removing mattresses from the cells during daylight hours, like the diet of "grue", is defended on the ground that if living conditions in the cells are made too comfortable inmates will contrive to get themselves consigned to the cells to avoid work. The court does not accept that particular argument either as to "grue" or as to the removal of the mattresses.

However, with respect to the mattresses a more cogent argument is made that the court does accept. The evidence re-

flects that when a violent inmate of one of the cells is "acting out," as the psychologists call it, he is quite apt to set his mattress on fire, or to tear the mattress up and stuff fragments in the toilet; and it is inferable that this "acting out" is more apt to take place during daylight hours when it is apt to gain more peer approval than if it took place at night when other inmates are trying to sleep or after the violent inmate himself has become fatigued. The court thinks that the respondents' argument is valid, and the practice of removing the mattresses in the daytime, while perhaps questionable, will be permitted to continue.

■ The court holds that the policy of sentencing inmates to indeterminate periods of confinement in punitive isolation is unreasonable and unconstitutional. The court thinks that determinate sentences of no more than a prescribed number of days must be imposed. In so holding the court does not imply for a moment that there are not some inmates who must be segregated from the general population for any one or more of a number of reasons, and does not condemn that practice. Cf. Kelly v. Brewer, supra. But segregated confinement under maximum security conditions is one thing; segregated confinement under the punitive conditions that have been described is quite another thing.

■ As to the length of the maximum sentences that may be imposed, the court notes that Mr. Hutto is of the view that basically the maximum period of time in which a man should be confined in punitive isolation with a restricted diet, with no mattress in the daytime, and perhaps without a bunk to sleep in at night is fourteen days. In view of the changes in the conditions of confinement in punitive isolation that the court is ordering, the court feels that a maximum sentence of thirty days is permissible. If at the end of that maximum period, it is found that an inmate should not be returned to population, he may be kept segregated but under conditions which are not punitive. Of course, a disciplinary committee may impose a sentence of less than thirty days, and the Superintendent of the institution or the Commissioner may direct that a convict be released from punitive isolation at any time prior to the expiration of his sentence.

Let the court point out in this connection that many acts which constitute serious violations of prison rules also amount to felonies under the laws of the State of Arkansas, and if an inmate commits such an offense he can always be prosecuted in the state courts and may receive a sentence in addition to the one that he was serving when he committed the offense.

The court is well aware of the fact that the changes that are being ordered with respect to punitive isolation and administrative segregation may cause a degree of consternation in the Department and, indeed, outside the Department. But, the court sincerely believes that these changes are not only constitutionally required, but also that they will produce both a more humane prison system and a system that is going to be more peaceful and orderly and easier to administer efficiently in the long run.

### The East Building at Cummins

In the section of this opinion that dealt with overcrowding the court stated that the population of the East Building at Cummins would have to be reduced. As far as the punitive wing and the administrative segregation wings of the East Building are concerned, the directives of the court in the immediately preceding section hereof ought to take care of the problem of overcrowding. However, there is a third wing of the building that must be dealt with, and there are some other conditions in the East Building that call for attention.

The third wing which may be thought of simply as a "maximum security" wing houses inmates who cannot safely be kept in general population. Some of those inmates require protective custody

to prevent them from being killed or injured by other inmates; some are sources of danger to other inmates or to prison personnel; others are high escape risks; and some may be in the wing under consideration for other reasons. While it is not so called in the Department, this wing in some institutions would probably be called the "administrative segregation" wing. Further references to inmates in this section of the opinion will be to persons who are not being held for trial on charges of disciplinary violations and who are not being punished for such violations, but who nevertheless are confined in the wing of the East Building which the court may refer to simply as the "third wing."

Third wing inmates are in certain respects better off than inmates confined in the punitive isolation and administrative segregation wings of the East Building, and are better off than inmates who are held under maximum security conditions in certain other prisons. They receive regular prison food; they have the same correspondence privileges as do inmates in general population; they have certain commissary privileges; and they are permitted to spend part of their time outside their cells in what is known as the "day room." Moreover, they are not kept in the East Building all day. They work in the prison fields and gardens, and "10 Hoe" and "5 Garden" Squads are made up of inmates of the third wing of the building.

Due to the deficiency that has been mentioned in the report of November 12, 1975 and the lack of other figures the court does not know how many men were confined in the third wing on November 12 or how many are confined there today. The court is sure, however, that at times more than two men have been confined to a single cell in the third wing, and the court finds that a single cell in the third wing is overcrowded when it is has more than two men in it just as the cells in the punitive wing and the administrative segregation wing are overcrowded when occupied by more than two men at the same time. The

requirements of the preceding section with respect to cell capacity and bunks will also be made applicable to the third wing of the East Building.

While, as indicated, third wing inmates are better off in certain respects than the inmates of the other wings, there is no question that they are not as well off as inmates in general population and suffer deprivations that general population inmates do not suffer.

Such being the case, the Constitution requires that the status of inmates of the third wing be evaluated and reevaluated periodically in order to determine whether or not particular inmates can safely be returned to population or whether they should be transferred to other institutions.

The matter of periodic evaluations of the situations of convicts held in maximum security and segregated from the general population was before the Court of Appeals in *Kelly v. Brewer, supra*. In that case the court held that such evaluations must take place and that they must be made in the light of relevant, objective criteria, although the court recognized that the proper evaluation of the status of one inmate might require less effort and consideration than the evaluation of the status of another inmate.

In *Brewer* the court also held that there are certain criteria that may not properly be employed in the evaluation process. Specifically, the court held that the evaluating authority may not properly consider adverse staff reaction to a return of an inmate to population, or the deterring effect on other inmates that might result from holding a particular inmate or inmates in segregated confinement. And it was further held that the evaluating authority is not to give undue or artificial weight to the offense of which the inmate in question was convicted originally, although, of course, the nature of that offense is a factor for consideration.

The determination of whether an inmate is to be retained in segregation or returned to population is not so much a

question of what he has done in the past but of what he is likely to do or have done to him in the future if he is returned to population. In the last analysis the question is one of behavior prediction, and its answer must be left largely to the discretion of the prison administration. Ordinarily, judicial review of an administrative determination that an inmate should remain in segregated status should be limited to an inquiry as to whether the action in question was arbitrary or capricious or was invidiously discriminatory.

The requirement of evaluation and re-evaluation of inmates held under maximum security conditions may seem burdensome to some prison administrators, but it is necessary to protect inmates from being held indefinitely in that status after the original reason for their being placed in it has ceased to be valid or relevant.

The court is going to direct Superintendent Lockhart to review as soon as practicable the status of all convicts now confined in the third wing, and to return to population such inmates, if any, of that wing who can be returned without serious risk to the inmate, to other inmates, to prison personnel or to the security of the prison.

In the future, the cases of all inmates of the third wing are to be re-evaluated by at least the Assistant Superintendent in charge of security at Cummins not less often than once every sixty days, and the cases of all inmates in that wing are to be reviewed at least once a year by the Superintendent personally.

The evaluation process should involve interviews with the inmates out of the presence of other inmates, and should also involve consideration of psychiatric or psychological opinions to the extent that the same may be available. And the court will say that one of the things that it had in mind in directing the employment of one or more full time psychologists or psychiatrists by the Department is the useful function that such specialists can perform in determining whether or not an inmate should continue to be held in segregated status.

It occurs to the court that friction and confrontations between inmates of the East Building and East Building staff may be due in part to the fact that some of the higher ranking personnel of the East Building may have been kept on that station too long and have been dealing with the same inmates too long. Commissioner Hutto and Superintendent Lockhart should give serious consideration to rotating the higher ranking employees assigned to the East Building as well as to rotating ordinary correctional officers.

One problem that arises in the East Building is the failure at times to repair promptly damage to the cells and their furnishings resulting from inmate vandalism. In consequence inmates at times have been removed from badly damaged cells and placed in other cells with other inmates thus overcrowding them or aggravating an already overcrowded condition.

The record reflects that those who designed the East Building assured the Department that the building and its facilities were proof against damage by inmates. Such has been far from the case. It is hard for the court to believe, however, that American technology and engineering is not sufficiently advanced in this day and age to equip prison cells with facilities such as lighting and plumbing facilities and locks that inmates cannot destroy or seriously damage with their bare hands or such simple tools or other means as they may be able to devise. If anything practical can be done in that direction, it should be.

Some of the most dangerous and troublesome of the occupants of the East Building are blacks who are or claim to be Black Muslims. Like Muslims in general population, they claim to be the victims of religious as well as racial discrimination. Their principal complaints relate to diet, a subject with respect to which the court has already undertaken to deal, and about restrictions on reli-

gious assemblages and access to the inmates by Muslim ministers.

The Muslim inmates of the East Building are entitled to the same, but no greater, privileges in the area of religious worship, including visits by clergymen, as are accorded to inmates of the building who profess other religious faiths. It must be kept in mind that if an inmate is being held legitimately under maximum security conditions of confinement, his exercise of his religion is necessarily somewhat more circumscribed for legitimate security reasons than is such exercise by an inmate who is not a security risk and who is living in the general prison population. For example, the prison administration may legitimately prevent an inmate in general population from visiting an East Building inmate even though the former may be or claim to be a minister and even though the ostensible reason for his calling on the other inmate is to serve the latter's religious needs. Moreover, free world ministers who desire to pay religious calls on inmates of the East Building are subject to reasonable security measures such as reasonable searches for weapons or other contraband. However, the restrictions imposed on visitations by free world clergymen must not be unreasonable or such as are purposely designed to discourage ministers from the outside world from visiting maximum security inmates or other inmates for that matter.

Returning now to the subject of overcrowding of the administrative segregation and punitive isolation cells at Tucker and the overcrowding of the cells in all three wings of the East Building at Cummins, the court observes from the report of November 12, 1975 that as of that date the punitive isolation cells at Tucker with a capacity of 14 men had only three men in them, and that there were 13 men in the administrative segregation cells with an equal capacity of 14 men. Thus by the court's standards, if there were no more than two men in the same cell and if each man had a bunk, the maximum security facilities at Tuck-

er were not overcrowded on that date. What the situation is today, the court does not know.

It is possible that when this opinion and its accompanying decree are filed, none of the maximum security cells at either institution will be overcrowded. While the court thinks that the existence of such a situation is improbable, if it does exist, well and good. Respondents will simply be required not to let the cells become overcrowded.

Assuming, however, that compliance with the court's decree will require a substantial reduction of the populations of the maximum security cells at either Cummins or Tucker, or both, the court does not think that the respondents should be required to effect the reduction over night or in a haphazard manner. The court feels that respondents should have a reasonable but comparatively short period of time within which to effect necessary reductions, and now sets that period at thirty days from the filing date of the decree. However, the court's prohibition against limited diets will go into effect immediately.

It will be remembered that in the preceding section of this opinion the court fixed thirty days as the maximum period of time during which an inmate may be confined in punitive isolation. Any inmates who have been confined in punitive isolation for thirty days or longer must be returned to population or held in maximum security under conditions that are not punitive. And inmates who at the time of the filing of the decree herein who have been in punitive isolation for less than thirty days are to be deemed as serving sentences of not more than thirty days.

This section of the opinion is the last of what may be called its "substantive" sections. There are, however, some other matters to be considered.

### Attorneys' Fee and Expenses

When this litigation was first commenced, the court appointed Messrs. Steele Hays and Jerry T. Jackson, capa-

ble members of the Little Rock Bar, to represent petitioners, and their efforts contributed to the *Holt I* decision from which there was no appeal. The court did not award Mr. Hays or Mr. Jackson any fee, and the court does not recall that they requested an award.

After *Holt I* was decided, the attorneys just mentioned were excused from further duty. When the litigation was reactivated, the court appointed Messrs. Jack Holt, Jr. and Philip Kaplan of Little Rock to represent the inmates. Mr. Holt and Mr. Kaplan have been in the case ever since and have rendered yeoman service to their clients. In 1974 when certain inmates of the East Building were permitted to institute a class action of their own, Mr. Phillip H. McMath of Little Rock was appointed to represent them, and he remained actively in the case after the East Building suits were consolidated with the others.

In 1973 in connection with the *Holt III* decision the court allowed Messrs. Holt and Kaplan an $8,000.00 fee and certain expenses. Those items were paid by the Department of Correction. However, Mr. McMath has never received anything for his services, and Mr. Holt and Mr. Kaplan have received nothing attributable to the *Holt III* appeal or to the present phase of this litigation.

The court's 1973 award that has been mentioned was based in part on the theory that counsel had performed valuable services not only to the inmates but also to the people of the State of Arkansas as well. In other words, the award was based in part on the "private attorney general" theory. 363 F.Supp. at 217.

After the decision in *Holt III*, the Supreme Court of the United States decided *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), and *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). While the court is of the opinion that Mr. Holt and Mr. Kaplan deserve an additional award of fee and expenses, and that Mr. McMath ought to receive a fee for his services, it is necessary for the court to consider whether in the light of either or both of the Supreme Court decisions just mentioned it has the power to make the awards in question. In approaching the problem the court recognizes that as far as the class action phase of the litigation is concerned, the real party respondent is the Department of Correction itself which is an agency of the State of Arkansas. And the court recognizes that any valid award made by it will be paid and should be paid out of state funds in the hands of the Department rather than by the individual respondents personally.

In *Edelman v. Jordan, supra,* the Supreme Court held that while a federal court may grant prospective injunctive relief against state agencies and state officials which may impose financial burdens on the treasury of the state, the eleventh amendment to the Constitution prohibits the federal courts from making retroactive pecuniary awards that will have to be paid out of the funds of the state, unless the state has waived its sovereign immunity.

In *Alyeska, supra,* the Supreme Court rejected the "private attorney general" theory as a basis for awards of attorneys' fees to prevailing parties in federal court litigation, and held that such fees are allowable only when authorized by statute or when a case falls within one of the long-established exceptions to the "American Rule" which prescribes that each litigant must pay his own lawyer. The exceptions to the rule are that a court of equity may award an attorney's fee where (1) the losing party has been in violation of a court order; (2) the prevailing party has created a fund for the benefit of himself and others, in which case a fee payable out of the fund may be allowed; and (3) the losing party has acted in bad faith, vexatiously, wantonly or oppressively. 421 U.S. at 247–71, 95 S.Ct. at 1616–28, 44 L.Ed.2d at 147–61.

Not long ago this court had *Alyeska-Edelman* problems arise in *Arkansas Community Organization for Reform Now (ACORN) v. Brinegar,* 398 F.Supp. 685 (E.D.Ark.1975), *aff'd,* 531 F.2d 864

(8th Cir. 1976). *ACORN,* like *Alyeska,* was a "public interest" suit brought by private organizations and individuals for the purpose of protecting the environment. The defendants fell into two classes. One class included the Secretary of the United States Department of Transportation and officials of the Federal Highway Works Administration. The other class was made up of the members of the Arkansas State Highway Commission and officials of the Arkansas State Highway Department. The plaintiffs prevailed in large measure and obtained injunctive relief. However, the court felt that *Alyeska* precluded the allowance of any fee to plaintiffs' attorneys. Since the plaintiffs were entitled to recover only one award of costs, and since that award could be collected from the government as provided by 28 U.S.C. § 2412, the court found it unnecessary to decide at the time whether in view of *Edelman* the "state defendants" were liable for costs that would have had to be paid out of Arkansas Highway Department funds.

As to whether *Edelman* precludes an award of attorney's fees against state agencies or against state officers sued in their official capacities, the Courts of Appeals appear to be divided, and the question will probably have to be settled ultimately by the Supreme Court. Cases allowing fees notwithstanding *Edelman* include *Thonen v. Jenkins,* 517 F.2d 3 (4th Cir. 1975); *Souza v. Travisono,* 512 F.2d 1137 (1st Cir. 1975); *Class v. Norton,* 505 F.2d 123 (2nd Cir. 1974); *Boston Chapter NAACP v. Beecher,* 504 F.2d 1017 (1st Cir. 1974); *Milburn v. Huecker,* 500 F.2d 1279 (5th Cir. 1974). *See also* the dissenting opinion of Circuit Judge Gewin in *Newman v. State of Alabama,* 522 F.2d 71, 72 *et seq.* (5th Cir. 1975), in which opinion he was joined by Chief Judge Brown and Circuit Judges Wisdom, Thornberry and Goldberg.[13]

Cases in which a fee has been disallowed on the strength of *Edelman* include *Hallmark Clinic v. North Carolina Dept. of Human Resources,* 519 F.2d 1315 (4th Cir. 1975); *Skehan v. Board of Trustees of Bloomsburg State College,* 501 F.2d 31 (3rd Cir. 1974), *vacated on other grounds,* 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975); and *Jordon v. Gilligan,* 500 F.2d 701 (6th Cir. 1974), *cert. denied,* 421 U.S. 991, 95 S.Ct. 1996, 44 L.Ed.2d 481 (1975).

The cases holding that *Edelman* does not preclude the award of an attorney's fee that must be paid out of state funds characterize the allowance of the fee as being purely ancillary to prospective equitable relief properly granted against a state or a state agency. This court now takes that view. The subject is thoroughly and capably discussed in the dissent in *Newman v. State of Alabama, supra.*

That the award of an attorney's fee in a civil rights case on the "private attorney general" theory is improper in the absence of a statute allowing such an award was recognized by the Court of Appeals for this circuit in *Gilliam v. City of Omaha,* 524 F.2d 1013, 1017 (8th Cir. 1975). But, in the earlier case of *Doe v. Poelker,* 515 F.2d 541, 546–48 (8th Cir. 1975), the same court held that the case before it fell within one of the *Alyeska*

---

13. *Newman v. State of Alabama* involves alleged unconstitutionalities which have existed in the Alabama prison system. The district court granted relief and awarded an attorney's fee and expenses of litigation. *Newman v. State of Alabama,* 349 F.Supp. 278 (M.D.Ala. 1972); a panel of the Court of Appeals affirmed as to the equitable relief granted and reserved for en banc consideration the question of the allowability of the fee and expenses. *Newman v. State of Alabama,* 503 F.2d 1320 (5th Cir. 1974). The question presented was argued and submitted to the court en banc after *Edelman* was decided. In a terse per curiam opinion the majority of the en banc court remanded the case for further consideration in the light of *Alyeska* and *Edelman.* The dissenters felt that remand for *Edelman* consideration was unnecessary and would serve no useful purpose; they felt that the remand should be limited to the question of whether the defendants had acted in bad faith so as to bring the case within the *Alyeska* exceptions as far as some of the defendants were concerned. Thus, the majority of the en banc court did not hold that the fee and expenses were not allowable.

exceptions where the defendant Mayor had obstinately insisted on maintaining an anti-abortion policy in municipally owned hospitals in St. Louis after being on full and ample notice that the policy was unconstitutional or was probably unconstitutional. *See also Doe v. Poelker,* 527 F.2d 605 (8th Cir. 1976).

As indicated, this court does not feel that the allowance of a fee, costs, and expenses is precluded by *Edelman.* With respect to *Alyeska,* the court thinks that the case before it is markedly different in quality from *Alyeska* and also that it falls within the "bad faith" exception to the American Rule recognized in *Alyeska* and in *Doe v. Poelker, supra.*

In the first place, *Alyeska* was a private civil suit brought by environmentalists to prevent the construction of a pipeline in Alaska. No constitutional issues were involved. The instant case on the other hand involves the grave constitutional question of whether those in charge of the Arkansas Department of Correction and the prisons of the Department are continuing to deprive indigent convicts of fundamental rights and immunities guaranteed to them by the fourteenth amendment.

In the second place, the attorneys in this case who have labored so diligently on behalf of their inmate clients are not in the litigation on their own motion or by their own volition. They did not voluntarily enroll themselves under the banner of convict rights as the attorneys in the *Alyeska* case enlisted under the banner of environmental protection. Counsel in this case are here because they were appointed by the court and for no other reason.

The very variety of the issues discussed and the length of this opinion and of earlier opinions make it obvious that the claims of the convicts could not have been presented to the court intelligently by petitioners themselves; they had to have counsel. And their attorneys have been of assistance to the court as well as to the inmates.

Assuming arguendo, however, that the considerations just mentioned do not serve adequately to distinguish this case from *Alyeska,* the court thinks that in a legal sense respondents and their predecessors in office and employment have acted in bad faith and oppressively, and that the case falls within the "bad faith" exception to the *Alyeska* rule.

If one looks at the history of the Arkansas prison system from 1965 or 1966 down to the present day, one may note a continuous albeit erratic course of improvement. Some of that improvement would no doubt have taken place even in the absence of this litigation; and the court will observe that in recent years Arkansas governors and legislators, and members of what is now the Board of Correction, have shown marked sympathy with and affirmative response to prison needs, an attitude that was not always characteristic of former years. On the other hand, it is only fair to say that this litigation has served to impress upon Arkansas policy makers that if the prisons are to be operated at all, they must be operated in a constitutional manner, and has served as a spur to improvement. Moreover, the litigation,[e] including the efforts of petitioners' counsel herein, has served to bring to light certain problem areas that might have been overlooked otherwise.

In earlier stages of the case, when the grossest constitutional violations were brought to light, the prison administration tended to be cooperative in moving against the conditions and practices in question and indeed appeared to welcome the action of the court in requiring them to do what they wanted to do anyway but felt unable to do voluntarily.

It would be unfair to say that the attitude of the respondents is uncooperative today, but the court thinks that it has noted that with the passage of time and with improvements in prison conditions being made, there has been some hardening of Departmental attitudes and an unwillingness on the part of the prison administrators to go much if any farther than they have gone, and as has

been seen the progress that has been made to this date is still insufficient.

Another observation that may be made is that at practically every stage of the litigation evidence has brought to light practices of which those in higher prison authority were ignorant, and which they eliminated when the facts were disclosed. It seems to the court that the prison authorities should have discovered at least some of those conditions and practices for themselves and corrected them without waiting for them to be developed in the course of evidentiary hearings in this lawsuit.

Since 1968 the Department of Correction has been in what may be called a period of transition from a patently unconstitutional penal system and in the direction of a constitutional system. But, each major transitional step has followed the mandate of this court or of the Court of Appeals. And significantly at each stage of the litigation, remaining constitutional deficiencies have been discovered. In 1973 the court thought that the Department had moved far enough down the transitional road to permit this court to release its supervisory jurisdiction over the Arkansas prisons, but, as all concerned know, the Court of Appeals sharply disagreed.

Enough on this subject has been said. The court is going to allow petitioners' attorneys a fee and certain expenses of litigation.

In fixing the amount of the fee, which counsel may divide among themselves as they see fit, the court will make no effort to adequately compensate counsel for the work that they have done or for the time that they have spent on the case. Adequate compensation would run into many thousands of dollars. On the other hand, the court is not willing to allow merely a nominal fee or one that has no relation to the work that counsel have done. The court is going to allow a substantial fee for the work done by counsel since the remand. Not only are the attorneys entitled to such a fee, but also the allowance thereof may incline the Department to act in such a manner that further protracted litigation about the prisons will not be necessary.

From its consideration of the matter the court now awards a fee of $20,000.00 to be paid out of Department of Correction funds.

As to costs, the principal item of costs has been the fees paid to the court reporter for transcripts of depositions and testimony. As the litigation has proceeded, the court has entered certain orders under the terms of which a portion of those fees has been paid by the Department. The court now confirms those orders. This action, however, is without prejudice to the right of the Department at some later date or dates to seek reimbursement or recoupment from certain individual inmates whose individual claims now pending when considered may turn out to be frivolous or patently insubstantial. The court is not saying that there are such claims, but there may be.[14]

### Procedural Details

It is now necessary to wrap up procedurally the class action phase of this litigation so that it may be on its way to the Court of Appeals if either side cares to appeal, and the court assumes that one side or the other will so desire. It is also necessary to give some directions to the Clerk as to how this opinion and its accompanying decree should be handled.

Pursuant to this opinion the court will enter its Third Supplemental Decree. In order that the decree amount to an appealable order, the court, pursuant to Fed.R.Civ.P. 54(b), now determines that there is no just reason for delaying entry of the decree until disposition of the in-

14. The court will note that the transcript material in question will be available for appellate purposes without additional expense. Attention is called to the fact, however, that the testimony that was taken before the court personally at the outset of the remand hearings has not been transcribed, and the testimony that the court heard in 1974 has not been transcribed.

dividual claims and directs that the decree be entered forthwith.

The Clerk is now directed to file the original of this opinion and of the decree in the anchor case before the court, namely, *Holt, et al. v. Hutto, Commissioner of Correction, et al.*, D.C.Cir., 363 F.Supp. 194. Copies of the opinion and of the decree will be considered as having been filed in all of the cases consolidated with *Holt*, and a copy of the opinion and decree will be filed physically in any particular one of the consolidated cases upon the request of either side. Since the court may well have to consider individual inmate claims in all of the individual cases, the Clerk should not close for statistical purposes any of the cases at this time.

Just as the court sees no just reason for delay in entering a decree dealing with the class action aspect of the case, the court likewise sees no reason to delay disposition of the individual claims until an appeal, if there is one, from the class action decree is decided. That is true because decision of an individual claim either in favor of or against a particular inmate is not likely to run counter to the class action decision or to any probable holding of the Court of Appeals with respect to that decision. For example, a claim of Inmate X. that he was denied needed medication on a particular occasion can be decided one way or the other without particular regard to the over-all sufficiency of the health care provided by the Department for inmates in general. The court, therefore, will proceed to adjudicate the individual claims with all convenient speed. The court is probably going to need the help of counsel in connection with the individual claims, and, as a matter of fact, counsel for respondents have requested leave to brief the issues raised by certain individual claims separately from the general issues raised by the class claims. That leave will be granted; it occurs to the court that counsel for petitioners may likewise want to brief some individual claims separately, and the court will shortly be in touch with counsel on both

sides in connection with the individual claims.

While the court would like to relieve counsel for petitioners of their duties in the case at this time and while the court is sure that counsel would like to be relieved, the court does not think it practicable to release them until after the appeal, if any, from the class action decision has been disposed of and until after the court rules on the individual claims.

Since jurisdiction of the case is being retained, the Commissioner will be directed to file not later than July 15, 1976 a report showing what has been done toward complying with the directives and requirements of this opinion and its accompanying decree. The report must include data on the prison population in all institutions administered by the Department as of June 30 or July 1. Those data should be reported in a form conforming generally to the report filed on November 12, 1975, but there must be a breakdown among wings and a cell by cell statement of population in the East Building at Cummins. Further reports may be required in the discretion of the court.